■ In the Matter of ANNA SCHEFFEY-HOHLE, Respondent, v TRAVIS C. DURFEE, Appellant. [935 NYS2d 718]—

Egan Jr., J.

Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the unmarried parents of a daughter (born in 2000). Although the mother and the father were both in college when the mother became pregnant and they lived some distance apart, the father was present for the child's birth and thereafter enjoyed significant parenting time with the child pursuant to an informal agreement between the parties. When the child was three years old, the mother enrolled the child in preschool—effectively ending the then-shared physical custody arrangement—and married Steven Hohle (hereinafter the stepfather), with whom she subsequently had two sons. After the father completed his postgraduate work and relocated to Schuyler County, where the child resided, he sought to resume the shared physical custody arrangement. By order entered December 21, 2007 upon consent, Family Court awarded the parties joint legal and shared physical custody of the child. By all accounts, this arrangement proved to be eminently workable for the parties and, more to the point, extraordinarily beneficial to the child, who reaped the rewards of having two loving parents actively—and essentially equally—involved in her daily life.

Thereafter, in January 2010, the mother commenced this proceeding seeking permission to relocate with the child to Pittsburgh, Pennsylvania—approximately 5½ hours away from Schuyler County and where the stepfather had accepted a new job. Following a lengthy hearing, Family Court granted the mother's application, concluding that relocation was in the child's best interest and awarding the parties joint legal custody with primary physical placement to the mother and substantial visitation to the father. This appeal by the father ensued.[1]

Upon reviewing the record, it is apparent that the child is blessed with two skilled and devoted parents, each of whom clearly has her best interest at heart and each of whom has made various sacrifices upon her behalf.[2] The child also enjoys a loving relationship with the stepfather and her half siblings, as

---

1. The father's subsequent application for a stay pending appeal was denied by a Justice of this Court.

2. For example, the mother waited until the end of the school year to bring the instant proceeding—so as to avoid pulling the child out of school

well as with the father's live-in girlfriend and her young children, and being surrounded by this caring and supportive family network plainly has enabled the child to thrive. However, these very blessings, together with the fact that the parents stand upon essentially equal footing with one another, made Family Court's decision all the more difficult, as it was faced with the unenviable task of determining which parent potentially would be deprived of regular and meaningful access to the child.[3] It is clear that Family Court struggled with this dilemma—as have we—but despite the court's well-reasoned decision, we are obliged to reverse, deny the mother's relocation request and dismiss the underlying petition.

As the party seeking to relocate, the mother bore the burden of establishing by a preponderance of the credible evidence that the proposed relocation would be in the child's best interest (*see Matter of Kirshy-Stallworth v Chapman*, 90 AD3d 1189, 1190 [2011]; *Matter of Munson v Fanning*, 84 AD3d 1483, 1484 [2011]; *Matter of Sofranko v Stefan*, 80 AD3d 814, 815 [2011]). "Among the factors to be considered in determining whether relocation is in the child's best interest are each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements" (*Matter of Sniffen v Weygant*, 81 AD3d 1054, 1055 [2011] [internal quotation marks and citations omitted], *appeals dismissed* 16 NY3d 886 [2011], 17 NY3d 884 [2011]; *see Matter of Hissam v Mancini*, 80 AD3d 802, 803 [2011], *lv dismissed and denied* 16 NY3d 870 [2011]; *Matter of Solomon v Long*, 68 AD3d 1467, 1469 [2009]).

Here, the stated impetus for the requested relocation was the stepfather's acceptance of a new job in Pennsylvania. Previously, the stepfather operated a guided navigation system used

mid-semester—and did not relocate to Pennsylvania until she had Family Court's permission to do so. And, as will be discussed in greater detail, the father changed careers and relocated more than once in order to maintain his relationship with his daughter.

**3.** We say "potentially" because the mother did not rule out remaining in New York if permission to relocate was denied. Similarly, although hoping to avoid forfeiting his budding teaching career and tenure track position, the father did not foreclose the possibility of pursuing certification and obtaining employment in Pennsylvania.

in oil and natural gas exploration—a position he had held for 15 years and in which he was engaged at the time he and the mother married. This position required him to travel extensively and resulted in him periodically being away from home for six-to-eight-week stints—facts that admittedly were known to the mother at the time of the marriage. When his "rig" was idle, the stepfather received his base salary of $40,000 per year; for each day that he was on site, however, he received "field pay," enabling him to earn between $110,000 and $120,000 per year.

In January 2010, the stepfather received an offer to work in a supervisory position in his employer's regional office in Pittsburgh. Although this position reduced the stepfather's annual salary to $90,000, he testified that his new job represented both a steady and predictable source of income and an overall improvement in his—and his family's—quality of life.[4] Notably, at the time the stepfather accepted the position, he had not been laid off, and there is nothing in the record to suggest that he was in any real danger of losing his job. Rather, it appears that the stepfather accepted the new position based upon his fear that he might eventually, at some theoretical point in the future, lose his job—despite the fact that he had not been laid off even once during the course of his 15 years with his employer.

To be sure, the stepfather cannot be faulted for wanting to travel less, but the relocation effectively shifts the travel burden from the stepfather to the child and her biological father. Further, while we recognize that the demands posed by the mother's marriage, as well as her desire to keep her new family intact, are factors to be considered in evaluating the relocation request (see Matter of Vargas v Dixon, 78 AD3d 1431, 1432 [2010]), the balance of the Tropea factors (see Matter of Tropea v Tropea, 87 NY2d 727, 740-741 [1996]), in our view, do not militate in favor of the child's relocation.

As to the quality of the child's relationship with her respective parents, it is clear that the mother and the father dote on her and that she, in turn, has a close and loving relationship with each of them. Although there is an argument to be made—despite the nearly equal periods of physical custody—that the mother has been the child's primary caregiver, the father's devotion to the child is, as Family Court aptly observed, virtually unparalleled. The father moved twice—first leaving his journal-

---

4. Instead of working 12-hour days, seven days a week and being away from home for extended periods of time, the stepfather would be working a standard 40-hour week, thereby enabling him to, among other things, be home at night with the mother and the children.

ism career in Albany County to pursue a Master's degree in Tompkins County, where he would be closer to the child, and then relocating to Schuyler County, where he eventually obtained a teaching position in the child's school district. Moreover, when the mother and the stepfather pursued a business opportunity that could have resulted in the child having to change schools, the father undertook to purchase property within the district so that the child could remain in the same school.[5] The record further reflects—and no one disputes—that the father, who coaches the child's soccer team, is significantly involved in her life and that she, in turn, benefits greatly from this relationship (*see Matter of Munson v Fanning*, 84 AD3d at 1485; *Matter of Solomon v Long*, 68 AD3d at 1468-1469; *compare Matter of Sniffen v Weygant*, 81 AD3d at 1056 [father visited with children only sporadically, often failed to pay child support and did not attend school functions or otherwise meaningfully participate in their lives]; *Matter of Hissam v Mancini*, 80 AD3d at 804 [mother exercised poor parental judgment and engaged in conduct that was emotionally and psychologically harmful to the child]; *Matter of Vargas v Dixon*, 78 AD3d at 1432-1433 [father failed to regularly exercise visitation and had limited involvement in child's education]; *Matter of Sara ZZ. v Matthew A.*, 77 AD3d 1059, 1060-1061 [2010] [father engaged in domestic violence against the mother, had limited supervised visitation with the child and rarely attended his school functions or athletic events]).

For these reasons, there can be no serious question that the child's relocation would significantly impact upon the quality and quantity of her future contact with the father (*see Matter of Munson v Fanning*, 84 AD3d at 1485; *Matter of Mallory v Jackson*, 51 AD3d 1088, 1090 [2008], *lv denied* 11 NY3d 705 [2008]; *Matter of Paul v Pagnillo*, 13 AD3d 971, 972-973 [2004]). Although the mother admittedly expressed a willingness to be generous with visitation, the mere fact that the father arguably might, under a proposal proffered by the mother at the hearing, wind up with approximately the same number of total hours of visitation each year does not change the fact that the father will be deprived of regular and meaningful access to his child and, more to the point, that she no longer will benefit from his consistent presence in her life.

We reach a similar conclusion regarding the feasibility of maintaining the father/daughter relationship through a long-

---

**5.** When the business opportunity fell through, the father was contractually obligated to go through with the purchase, and he now operates the property as a bed and breakfast.

distance visitation arrangement. Although the visitation sched-
ule fashioned by Family Court admittedly was extensive, we are
troubled by, among other things, the feasibility of compelling
the child to spend a total of 10 to 11 hours in the car every
other weekend traveling between Pennsylvania and Schuyler
County—particularly in view of the child's desire to participate
in soccer and dance. Such a schedule, in our view, not only
significantly disrupts the relationship that the child and the
father previously enjoyed but, further, impacts upon the child's
ability to regularly engage in everyday social and extracurricular
activities with her friends and classmates.

Finally, we are not persuaded that the mother met her burden
of establishing that relocation would substantially enhance the
child's economic, emotional or educational well-being. Again,
while we do not begrudge the stepfather's desire to improve his
professional lot in life and acknowledge that having him home
on a more regular basis would no doubt benefit the family as a
whole, the fact remains that his new position entailed a
substantial pay cut (see Matter of Sofranko v Stefan, 80 AD3d at
816; Matter of Mallory v Jackson, 51 AD3d at 1089), which tends
to undermine any assertion that the move was motivated by
economic necessity.[6] Further, as should be evident from the fore-
going discussion, we are hard pressed to conclude that the move
would enhance the child's overall emotional development and
well-being, as she was—by all accounts—flourishing in her then-
existing environment. Finally, even accepting that it might be
easier for the mother to pursue a postgraduate degree in a more
metropolitan area, there is nothing in the record to suggest that
the child's educational opportunities will be substantially
enhanced by the move. Noticeably absent from the testimony
adduced at the hearing was any evidence that the schools in the
Pittsburgh area were superior to those in Schuyler County,
where—according to her teacher and parents—the child was a
gifted student (see Matter of Kirshy-Stallworth v Chapman,
2011 NY Slip Op 08867, *2-3; Matter of Mehaffy v Mehaffy, 23
AD3d 935, 937 [2005], lv dismissed 6 NY3d 807 [2006]; Matter
of Paul v Pagnillo, 13 AD3d at 973).

In short, while there indeed are certain factors that militate
in favor of relocation, we cannot say—based upon our review of
the record as a whole and after giving due consideration to all
of the relevant concerns—that the mother met her burden of
establishing that relocation would be in the child's best interest

---

6. We note in passing that the mother and the stepfather made only limited
inquiries into obtaining alternative employment in and around Schuyler
County.

(*see Matter of Munson v Fanning*, 84 AD3d at 1484-1485; *Matter of Solomon v Long*, 68 AD3d at 1469-1470). Accordingly, we now reverse Family Court's order, dismiss the mother's petition and direct that Family Court's order entered December 21, 2007 remain in full force and effect.

In reaching this result, we are mindful of the fact that the child is in the middle of the school year and that the mother, who went through with the move only after receiving permission from Family Court to do so, is now faced with the prospect of either relinquishing physical custody of the child to the father or relocating all (or part) of the remainder of her family back to New York. For this reason, we hereby stay entry of this Court's order for 30 days in order to afford the parties an opportunity to devise an appropriate plan for the child's return to New York.

Spain, J.P., and Garry, J., concur.

Lahtinen, J. (dissenting). Respectfully, we dissent. Relocation cases often involve particularly vexing issues (*see Matter of Tropea v Tropea*, 87 NY2d 727, 736 [1996] [characterizing relocation cases as presenting "some of the knottiest and most disturbing problems" faced by courts]). This is such a case; on that point, all are in agreement.

Family Court heard the testimony of the parties as well as the other witnesses. It observed and listened to the child while conducting an in camera interview. Recognizing the importance of viewing witnesses to the evaluation of their "testimony, character and sincerity" when weighing factors pertinent to a child's best interest (*Eschbach v Eschbach*, 56 NY2d 167, 173 [1982]), we typically do not disturb the determination of the trial court in a case of this nature so long as its determination is supported by a sound and substantial basis in the record (*see Matter of Vargas v Dixon*, 78 AD3d 1431, 1433 [2010]; *Matter of Winn v Cutting*, 39 AD3d 1000, 1001 [2007]; *Matter of Leach v Santiago*, 20 AD3d 715, 716 [2005], *lv denied* 6 NY3d 702 [2005]; *Matter of Grathwol v Grathwol*, 285 AD2d 957, 958 [2001]). In a detailed, well-reasoned decision that thoroughly discussed and weighed relevant factors, Family Court determined that relocation was in the best interest of the child. In our view, there is a sound and substantial basis in the record supporting Family Court's determination. Accordingly, we would affirm.

Rose, J., concurs. Ordered that the order is reversed, on the law, without costs, petition dismissed and the order entered December 21, 2007 shall remain in full force and effect subject to the 30-day stay imposed herein.