Spain, J.
Appeals (1) from two orders of the Family Court of Tompkins County (Sherman, J.), entered June 22, 2012 and July 10, 2012, which, among other things, dismissed petitioner’s application, in two proceedings pursuant to Family Ct Act article 6, to modify a prior order of custody, and (2) from an order of said court, entered August 17, 2012, which denied petitioner’s motion for reconsideration.
*1320 Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the divorced parents of a son, born in July 2010. The parties, who were married in 2009, separated in May 2011. They entered into a joint custody arrangement — with shared decision-making authority — contained in a separation agreement in December 2011, with physical placement with the mother and weekly parenting time with the father, which prohibited relocation of the child without the consent of the other parent or the court. Their agreement was later incorporated into, but not merged with, the parties’ January 2012 judgment of divorce. In February 2012, just a few months after their agreement, the mother received and accepted an offer of employment in New Jersey. After the father denied his consent to allow the mother to relocate with the child from the City of Ithaca, Tompkins County to New Jersey, she commenced this proceeding requesting permission to relocate, to which the father cross-petitioned, objecting to the relocation and seeking sole custody. Family Court permitted the mother to relocate with the then-18-month-old child on a temporary basis pending disposition of the proceeding, and she moved to East Windsor, New Jersey, approximately 230 miles (472 hours) from Ithaca in March 2012. However, following a two-day fact-finding hearing in May 2012 at which the mother — then a recent law school graduate — appeared pro se, the court dismissed the mother’s application and granted sole custody to the father. Thereafter, the mother made a motion to reconsider, which the court denied. The mother now appeals.*
The ultimate issue in any custody dispute is which arrangement suits the best interests of the child, that is, “it is the rights and needs of the child[ ] that must be accorded the greatest weight” (Matter of Tropea v Tropea, 87 NY2d 727, 739 [1996]). In a relocation case, to determine a child’s best interests, the court must consider several factors, such as “each parent’s reasons for seeking or opposing the move, the quality of the relationships between the child and the [moving] and [nonmoving] parents, the impact of the move on the quantity and quality of the child’s future contact with the [nonmoving] parent, the degree to which the [moving] parent’s and child’s life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the [non-moving] parent and child through suitable visitation arrangements” (id. at 740-741; see Matter of Scheffey-Hohle v Durfee, 90 AD3d 1423, 1425 [2011], appeal *1321 dismissed 19 NY3d 876 [2012]). These factors governing a relocation determination are not an exhaustive list and the court is expected to consider any other relevant factors (see Matter of Herman v Villafane, 9 AD3d 525, 526-527 [2004]; Thompson v Smith, 277 AD2d 520, 521 [2000]). It is the party seeking to relocate who bears the burden of demonstrating, by a preponderance of the credible evidence, that such a move is in the child’s best interests (see Scott VV. v Joy VV., 103 AD3d 945, 946 [2013], lv denied 21 NY3d 909 [2013]; Matter of Kirshy-Stallworth v Chapman, 90 AD3d 1189, 1190 [2011]; DeLorenzo v DeLorenzo, 81 AD3d 1110, 1111 [2011], lv dismissed 16 NY3d 888 [2011]). On review, this Court will not disrupt a relocation determination unless it lacks a sound and substantial basis in the record (see Rose v Buck, 103 AD3d 957, 958 [2013]; Matter of Feathers v Feathers, 95 AD3d 1622, 1623 [2012]). Finally, given Family Court’s unique opportunity to hear and assess the testimony, its credibility determinations are accorded great deference on appeal (see Eschbach v Eschbach, 56 NY2d 167, 173 [1982]; Matter of Pizzo v Pizzo, 94 AD3d 1351, 1352 [2012]; Matter of Sofranko v Stefan, 80 AD3d 814, 815 [2011]).
The mother’s primary reason for seeking the relocation is that she was reportedly only able to find employment in her field in New Jersey. The mother initially attended law school in the midwest and then finished her final year at Cornell University in 2011. In February 2012, the mother was offered and accepted a position as a law clerk for a New Jersey judge. According to the mother, the full-time clerkship — which was scheduled to end in September 2013 — involves regular daytime hours and she is allowed 14 days of sick time and 14 days of vacation per year. Her salary was set at $43,000 annually.
While the mother testified that she took the only employment offer extended to her and, thus, she had no choice but to relocate, there is little evidence in the record regarding her job search in the area surrounding the parties’ former marital home in Ithaca, either before her clerkship or upon its anticipated completion. She submitted evidence of her email account, which showed various correspondence relating to her search for employment. However, these records did not indicate that any of the jobs she applied for were in the Ithaca area and, furthermore, she could not specifically remember any positions that she had applied for locally. The father submitted evidence to support his position that the mother’s reason for relocating— that this was her only job offer — was a pretense and that she never intended to remain in the Ithaca area. He introduced a list that the mother had left in the marital home after she *1322 moved out, which included the following goals: “getting a job” and “moving out of NY,” and he testified that the mother had consistently been talking about relocating to New Jersey.
The father opposed the relocation mainly because it greatly reduced the amount of time that he had with the child and because a parallel move by him would not be feasible. He is employed as an assistant professor of mechanical and aerospace engineering at Cornell. Initially, he was offered a three-year position; at the expiration of that term, he received a one-year extension that was set to expire in June 2013, and he expected to be reappointed for another three-year term as an associate professor. He stated that while tenure was not guaranteed, he did not want to leave Cornell where he is paid $108,220 annually, and that it would be difficult to find a similar position. He presented the testimony of a colleague in the same department who testified that faculty positions in the father’s field are relatively rare and that there are only a handful of openings in the United States each year.
As to the father’s parenting time, he was granted every other weekend in the temporary order, which he faithfully exercised. That order required the parties to exchange the child in a central location in Pennsylvania; however, the exchanges were fraught with tension for everyone involved, so the parents altered the arrangement so that the father would pick the child up on Friday in New Jersey and the mother would pick him up on Sunday in Ithaca. Despite this new arrangement, the difficulties continued, and the mother conceded that this arrangement was “not good for” anyone in the family, and that the long drives were exhausting and put the child at risk.
The testimony of both parents reflected that each had a loving relationship with the child. The mother testified that she had been the child’s primary caregiver from the beginning. The child was born in the summer prior to the mother’s third year in law school, and she testified that she thereafter took care of him almost all of the time except when she was studying or in class. During the fall semester, the maternal grandmother stayed with the family to help care for the child and did so while the father was at work and the mother was involved with her school work. After the grandmother left, the parents hired a nanny to watch the child until he started attending day care in January 2011. The mother testified that the child had special dietary needs and that she made the bulk of his food herself, and that she bathed and dressed him daily and potty-trained him. Additionally, she testified that the father did not participate in the child’s life, specifically that he “didn’t do anything *1323 with us . . . [he] didn’t go to parks[, to] birthday parties[, to] the neighborfs] to play.” She also testified that she took the child to almost all of his doctor appointments and that the father rarely took him.
In contrast, the father testified that, during the spring of 2011, he had attended six of the child’s eight doctor appointments. The father acknowledged that the mother had spent more time with the child during the marriage, and that he often did not arrive home until 7:00 p.m., but that he spent time with the child before bedtime; he also testified that he often took the child to day care. Significantly, the mother filed a family offense petition against the father on May 17, 2011, alleging harassment and attempted assault. As a result, a temporary order of protection was put in place and the father had to leave the marital dwelling and was not allowed to contact the mother or the then-infant child for almost two months, until July 2011, and was not allowed to have overnight visits until August 2011. The father testified that the allegations were false and that the petition was eventually dismissed prior to any hearing. While the mother was the primary caregiver before the parties’ separation, the record supports Family Court’s findings and conclusions that the father demonstrated regular involvement in the life of the child before the separation, during a period of time in the child’s infancy in which both parents were heavily committed to their work and school work. Likewise supported are the court’s findings as to the father’s ability to appropriately care for and nurture the child during his post-separation parenting time, during which he made considerable efforts to improve his skills as a parent.
Both parents testified that they would have to place the child in day care while working. The mother testified that the child was currently attending a day care in New Jersey and submitted information about the class size and the facility. The father testified that he would continue placement of the child in the day care program in Ithaca, and submitted evidence that New York standards require a lower ratio of children to day-care workers than required in New Jersey. As to familial connections, the mother testified that her aunt and uncle live near her in New Jersey with their three children, and that the child plays with his cousins and knows his relatives’ names. She also testified that there are many young families in her apartment complex and that the child has played with neighborhood children. Similarly, the father presented testimony about the flexibility of his work schedule to accommodate the child’s needs when the child is not in day care, and how he arranges play *1324 dates with colleagues who have children the same age. While he has no family in the Ithaca area, his parents visit from time to time and are available to help out when needed. The mother, on the other hand, conceded that she was at odds with her mother and siblings.
As to the impact of the relocation on the father-child relationship, there was much testimony about the minimal capacity of the parties to communicate and arrange visitation without court intervention. The record amply supports the conclusion that the mother was not entirely willing to include the father in decisions regarding the child. The father testified that, prior to her move, in order to avoid interaction with each other, the parties alternated drop off and pick ups at day care as the point of exchange. After the mother relocated to New Jersey, there were acrimonious incidents when the child was exchanged. The father testified that, following the temporary relocation order, upon returning the child to the mother from a scheduled visit, she screamed at the father; the next exchange involved a similar confrontation in which the mother berated him and spoke with profanity in front of the child. He further testified that the mother had demanded last-minute changes to the visitation schedule. The father admitted that the parents have no ability to communicate and that the best form of communication between them is in writing, usually via email. He did acknowledge that the child loves both parents and that he wanted the mother to have an important role in the child’s life and, if granted custody, he would value her input and participation.
We reject the mother’s assertion that Family Court’s findings were inaccurate and show a bias against her. Her contention is essentially that the court was wrong and unfairly credited the father’s testimony over hers; for example, the mother argues that the court improperly found that the family offense petition and order of protection — issued in the same Family Court that denied the father access to the child for almost two months— were dismissed. The father testified that they were dismissed, and there is no evidence in the record to the contrary. Similarly, the mother argues that the court unfairly mischaracterized her as “unduly combative and aggressive” toward the father. There is no question that this was a credibility question resolved by the court, which was able to observe the parties’ behavior, demeanor and interactions throughout the proceedings. As to the court’s findings regarding the condition of the former marital home, they are amply supported in the record, which included numerous photographs of the disheveled condition in which the mother left the home when she moved out. The court was justifi *1325 ably concerned about the mother’s ability to provide a safe and clean home for the child and her utter lack of respect for the father. The court found that the mother’s explanation lacked credibility, and this finding is accorded deference (see Rose v Buck, 103 AD3d at 958). Overall, the court afforded the mother wide latitude as a pro se law school graduate, and our review of the record finds no support for her claim that the court’s decision was affected by any bias (see Matter of Memole v Memole, 63 AD3d 1324, 1326-1327 [2009]; Matter of Cobane v Cobane, 57 AD3d 1320, 1323 [2008], lv denied 12 NY3d 706 [2009]; see also Matter of Youngs v Olsen, 106 AD3d 1161, 1163-1164 [2013]).
The record further supports Family Court’s finding that the mother made no genuine effort to find a job in the Ithaca area and its conclusion that her claimed need to relocate was not substantiated (compare Matter of Winston v Gates, 64 AD3d 815, 818 [2009]; cf. Matter of Mehaffy v Mehaffy, 23 AD3d 935, 937 [2005], lv dismissed 6 NY3d 807 [2006]). The court’s conclusion that the father is the parent more willing to encourage a relationship with the other is based in the record, given the evidence that, among other things, the mother clearly attempted to thwart and frustrate the father’s visitation (see Matter of Adams v Bracci, 91 AD3d 1046, 1048-1049 [2012], lv denied 18 NY3d 809 [2012]). Accordingly, we find a sound and substantial basis in the record for the determination to deny the mother’s request to relocate the child to New Jersey and to award custody to the father.
Finally, we find persuasive the mother’s contention that requiring her to travel to Ithaca to pick up and return the child for all visitation is unduly onerous; even the father, in his testimony, found meeting midway for visitation to be preferable. However, given the passage of time and lack of record evidence regarding her current employment and location, this matter should be remitted to Family Court for further consideration of the appropriate exchange point for the child, under the parties’ current circumstances, unless they are able to reach an amicable, equitable arrangement.
Rose, J.E, Garry and Egan Jr., JJ, concur. Ordered the orders entered June 22, 2012 and July 10, 2012 are modified, on the facts, without costs, by reversing so much thereof as requires petitioner to drive to and from the City of Ithaca, Tompkins County for her alternate weekend visitation; matter remitted to the Family Court of Tompkins County for further proceedings not inconsistent with this Court’s decision and, pending said proceedings, the visitation terms of said orders shall remain in effect on a temporary basis; and, as so modified, affirmed.
*1326 Ordered that the order entered August 17, 2012 is affirmed, without costs.

 Although the mother filed a notice of appeal from the order denying reconsideration, she has made no arguments in her brief with respect thereto.